State of Maryland v. Peter Sutro Waine, No. 90, September Term, 2014

**COURTS – STARE DECISIS – *UNGER V. STATE*, 427 MD. 383 (2012) –** The Court may decline to follow precedent when the prior decision is clearly wrong, or when the precedent has been rendered "archaic or inapplicable to modern society through the passage of time and evolving events." The decision in *Unger v. State*, 427 Md. 383 (2012), is neither clearly wrong nor "archaic" in holding that this Court's prior decisions regarding the interpretation of Article 23 advisory only jury instructions created a new State constitutional standard that applies retroactively to all cases in which there were advisory only jury instructions.

**CRIMINAL LAW – POSTCONVICTION – DISCRETION TO REOPEN POSTCONVICTION PROCEEDINGS –** A court retains discretion to decide whether it is in the interests of justice to grant or deny a petition to reopen a postconviction proceeding. A change in the law intended to apply retroactively meets the "interests of justice" standard for reopening a petition for postconviction relief. Accordingly, after this Court's decision in *Unger v. State*, 427 Md. 383 (2012), the circuit court in the present case did not abuse its discretion to reopen the case to relitigate the constitutionality of a conviction based on a guilty verdict by a jury that was given an advisory only instruction.

**CRIMINAL LAW – POSTCONVICTION – WAIVER – FAILURE TO OBJECT TO ADVISORY ONLY JURY INSTRUCTIONS WILL NOT CONSTITUTE WAIVER –** Respondent's failure to object at trial to the trial judge's advisory only jury instructions did not preclude Respondent from asserting that claim in a postconviction proceeding. Convicted persons tried during the era of the advisory only jury instruction will not be precluded from seeking postconviction relief on the basis of waiver.

**CRIMINAL LAW – POSTCONVICTION – CHALLENGE TO ADVISORY ONLY JURY INSTRUCTION –** Advisory only jury instructions were not ambiguous, but rather, obviously erroneous, and thus, the "reasonable likelihood" test is not the proper framework to challenge advisory only jury instructions. The advisory only jury instructions permitted the jury to disregard bedrock due process instructions on the presumption of innocence, burden of proof, and reasonable doubt, constituting structural error not subject to harmless error analysis.

Circuit Court for Harford County
Case No. 12-K-75-005312
Argued: May 12, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 90

September Term, 2014

_____

STATE OF MARYLAND

v.

PETER SUTRO WAINE

_____

Barbera, C.J.,
*Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Filed: August 28, 2015

Opinion by Barbera, C.J.
Harrell and Adkins, JJ., join in judgment only.
Watts, J. dissents.

_____

*Harrell, J., now retired, participated in the hearing and conference of the case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

In May 2012, we decided *Unger v. State*, 427 Md. 383 (2012), and denied a motion to reconsider our decision in August of the same year. We granted certiorari to consider the State's request that we overrule what we decided in *Unger* little more than three years ago. We decline to overrule *Unger* and return to what once was the law. To hold otherwise would depart from the principles of stare decisis, generate uncertainty, and, ultimately, undermine trust and confidence in the rule of law.

I.

In order to appreciate the legal issues and arguments of the parties, it is useful at the outset to understand what this Court held in *Unger*. *Unger* followed a series of cases, *Stevenson v. State*, 289 Md. 167 (1980), *Montgomery v. State*, 292 Md. 84 (1981), and *State v. Adams*, 406 Md. 240 (2008), all of which involved the "advisory only" jury instruction prompted by Article 23 of the Maryland Declaration of Rights. Article 23 reads: "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction." This Court promulgated Maryland Rule 756b to implement Article 23.[1] The Rule required judges, "in every case in which instructions are given to the jury, [to] instruct the jury that they are the judges of the law and that the court's instructions are advisory only."

---

[1] Maryland Rule 756b was promulgated in 1961. Earlier versions of this Rule were similar in substance but were numbered differently. *See infra* n.3 (explaining, in more detail, the renumbering and restructuring of this Rule).

In 1980, this Court considered whether Article 23, as interpreted by prior decisions, ran afoul of the guarantees afforded State criminal defendants by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Court in *Stevenson* construed Article 23 to mean that only those instructions concerning "disputes as to the substantive 'law of the crime'" are advisory; all other instructions to the jury are binding. 289 Md. at 180. The next year, in *Montgomery*, the Court reinforced its *Stevenson* interpretation of Article 23, emphasizing that advisory only instructions are "limited to those instances when the jury is the final arbiter of the law of the crime." 292 Md. at 89.

Almost 28 years later, we decided *Adams*, a postconviction case. We concluded in *Adams*, essentially consistent with *Stevenson* and *Montgomery*, that, under Article 23, the jury's role as judge of the law in a criminal case is limited to disputes relating to the substantive law of the crime and "all other legal issues are for the judge alone to decide." 406 Md. at 256-59. Notable for present purposes, we held in *Adams* that the *Stevenson* interpretation of Article 23, as reinforced by *Montgomery*, "did not announce new law." *Id.* at 256. We further held in *Adams* that trial counsel's failure to object to the advisory only instruction constituted a waiver of Adams's right to challenge the instruction in the subsequent postconviction action. *Id.* at 266.

We re-examined our holdings in *Adams* three and a half years later in *Unger*. It was clear to the Court that "*Stevenson* and *Adams* were wrongly decided." *Unger*, 427 Md. at 417. The Court in *Unger* overruled "[t]hose portions of the Court's *Stevenson*, *Montgomery*, and *Adams* opinions, holding that the interpretation of Article 23 in *Stevenson* and *Montgomery* was not a new State constitutional standard." *Id.* We also

2

overruled the waiver holdings in those cases, *id.*, determining that the "failure to object to advisory only jury instructions in criminal trials prior to *Stevenson* will not constitute a waiver," *id.* at 391. We made those holdings fully retroactive. *Id.* at 416. The *Unger* decision effectively opened the door to postconviction relief for persons tried during the era of the advisory only jury instruction—an opportunity that had been foreclosed by *Stevenson*, *Montgomery*, and *Adams*.

Against this backdrop, we turn to the case before us.

II.

This case arises from the 1976 trial of Respondent, Peter Sutro Waine. Waine was tried before a jury in the Circuit Court for Harford County on two charges of first degree murder and a related larceny. At the close of all the evidence, pursuant to Rule 756b, the judge began his instructions to the jury with the following reference to Article 23:

> Under the Constitution and laws of the State, the jury in a criminal case is the judge of both the law and the facts and anything that I say to you about the law is advisory only. It is intended to help you, but you are at liberty to reject the Court's advice on the law and to arrive at your own independent conclusion on it, if you desire to do so.

The judge concluded his instructions with a reiteration of his opening instruction: "You are not partisans. You are judges, judges of the facts and the law. Your sole interest is to ascertain the truth from the evidence in the case." Waine's counsel did not object to those instructions. After deliberating for less than three hours, the jury returned guilty verdicts on all counts. The judge imposed consecutive life sentences on the two murder convictions and an additional 14 years, consecutive to the second life sentence, on the larceny conviction.

3

Waine noted an appeal to the Court of Special Appeals, which, in 1977, affirmed the judgment. *Waine v. State*, 37 Md. App. 222, 247 (1977). Waine, representing himself, made initial efforts to seek certiorari review and postconviction relief but, in the end, did not file the petitions.

In 1997, Waine, assisted by counsel, sought postconviction relief for the first time. Waine claimed ineffective assistance of counsel at both the trial and appellate levels, and asserted, among 19 other claims, that the trial judge erred when he gave the advisory only jury instructions. The postconviction court, in denying relief, rejected Waine's claim that the erroneous jury instructions contravened fundamental constitutional rights and ruled that this claim was waived by trial counsel's failure to object to the jury instructions during trial. The Court of Special Appeals denied Waine's application for leave to appeal the denial of postconviction relief.

In September 2007, counsel for Waine filed a motion to reopen the petition for postconviction relief, relying in part on *Jenkins v. Hutchinson*, 221 F.3d 679 (4th Cir. 2000). Jenkins had sought federal habeas corpus relief from his 1975 Maryland conviction. *Id.* at 681. He argued that the advisory only jury instruction given at trial violated his right to due process by allowing the jury to disregard the State's burden to prove his guilt beyond reasonable doubt. The United States Court of Appeals for the Fourth Circuit agreed with Jenkins.[2] The *Jenkins* court recognized the legal question as "whether the jury was

---

[2] The Fourth Circuit determined that, because the state court had addressed Jenkins's claim on the merits, the claim was not defaulted, and federal review was not precluded. *Jenkins*, 221 F.3d at 682-83.

4

effectively given any reasonable doubt instruction at all; for if the jury understood the advisory nature of the instructions as permitting it to ignore the reasonable doubt instruction, then the jury could fashion any standard of proof that it liked." *Id.* The court noted that, after *In re Winship*, 397 U.S. 358 (1970), it was no longer an "open question" that "the jury must be instructed that the Government is required to prove the defendant's guilt 'beyond a reasonable doubt[.]'" *Jenkins*, 221 F.3d at 684. The *Jenkins* court held, by application of *Winship*, that Maryland's advisory only jury instruction violates due process.

Waine's motion to reopen his postconviction proceeding lay dormant until 2012, when the circuit court, citing our recently filed opinion in *Unger*, granted the motion. The court found, based on *Unger*, that "it would be in the interest of justice to allow a reopening of the Petitioner's postconviction application in this court . . . on only one issue—the alleged erroneous jury instruction advising the jury that they were the judges of the law and the facts."

Following a hearing, the postconviction court issued a memorandum opinion granting Waine postconviction relief. The court rejected the State's claim of waiver as having been "foreclosed by *Unger*." The court also rejected the State's contention that Waine was not prejudiced by the advisory only instruction because of other instructions to the jury. The court concluded that the advisory only instruction went "to the very core of due process of law" and, based on the full retroactivity conferred by *Unger*, ordered that Waine was entitled to a new trial.

The Court of Special Appeals denied the State's application for leave to appeal in an unreported opinion addressing the merits of the postconviction court's grant of relief

5

under *Unger*. We granted the State's certiorari petition to answer three questions, which we have reworded:

1. Should *Unger* be overruled?

2. Assuming *Unger* is not overruled, did the circuit court exercise proper discretion in reopening Waine's postconviction proceeding, and more generally, does a circuit court retain discretion to deny reopening a postconviction proceeding to address a challenge to an advisory jury instruction?

3. Assuming *Unger* is not overruled, what is the proper standard by which a court should evaluate advisory only jury instructions?

## III.

The State urges us to overrule *Unger*, arguing that, in deciding *Unger*, we departed from stare decisis in an unprecedented and improper manner. The State protests that the decision has left circuit courts across Maryland "in turmoil" and has resulted in "chaotic" litigation. The State asks us to calm these unsettled waters by resurrecting *Adams*. Waine and *amici* in support of him and persons similarly situated urge us not to disturb *Unger* as the case declares the current state of the law and should remain intact, as faithful adherence to the doctrine of stare decisis demands.

"*Stare decisis* means 'to stand by the thing decided,' and is 'the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *Livesay v. Balt. Cnty.*, 384 Md. 1, 14 (2004) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)); *accord State v. Stachowski*, 440 Md. 504, 520 (2014). In *Stachowski*, we reiterated: "The crux of the doctrine of stare decisis is that

6

courts should reaffirm, follow, and apply ordinarily the published decisional holdings of our appellate courts even though, if afforded a blank slate, the court might decide the matter differently." 440 Md. at 520 (citing *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 689 (2013)).

We have recognized two exceptions for departing from stare decisis. "We may decline to follow the doctrine when persuaded the prior decision is clearly wrong, or when the precedent has been rendered archaic and inapplicable to modern society through the passage of time and evolving events." *Id.* (citation omitted); *see also Unger*, 427 Md. at 417 ("[U]nder the doctrine of *stare decisis*, a court's previous decisions should not be lightly set aside, nevertheless the rule of stare decisis is not an absolute.") (internal quotation marks omitted).

The State insists that *Unger* deviated from the doctrine of stare decisis and that a return to *Adams*, decided three and a half years earlier, is required. To the contrary, it is *Unger*, not *Adams*, to which the dictates of stare decisis must now apply. Unless we are persuaded that *Unger* is either "clearly wrong and contrary to established principles" or "superseded by significant changes in the law," we must leave the decision standing. *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 64 (2010) (internal quotation marks omitted). The State has not persuaded us that either of these exceptions applies.

The State makes no argument that *Unger* is archaic, superseded by a significant change in the law, or rendered inapplicable to modern society by the passage of time. The State concentrates solely on arguing that the decision was clearly wrong and contrary to established principles. The State argues that the *Unger* Court wrongly held that *Stevenson*

7

set forth a new interpretation of Article 23. The State picks its way carefully around the analysis in both *Stevenson* and *Unger* to paint a picture of clear error, but neglects to include the full bore of the Court's analysis for determining that a new constitutional rule had been laid in *Stevenson*.

The *Unger* Court, in reaching the legal conclusions that it did, applied the very principles of, and exceptions to, the doctrine of stare decisis that the State relies upon in seeking a return to the holdings of the *Stevenson*, *Montgomery*, and *Adams* cases. In *Unger*, this Court analyzed the law existing at the time of *Stevenson*, including Maryland Rule 756b[3] requiring courts to give the advisory only jury instruction. *See Unger*, 427 Md. at 411-16. We have reviewed independently the *Unger* Court's extensive analysis and need

---

[3] Maryland implemented Article 23 through Rule 756b:
> The court may and at the request of any party shall, give such advisory instructions to the jury as may correctly state the applicable law; the court may give its instructions either orally or in writing. The court need not grant any requested instruction if the matter is fairly covered by the instructions actually given. <u>The court shall in every case in which instructions are given to the jury, instruct the jury that they are the judges of the law and the court's instructions are advisory only</u>.

Md. Rule 756b (emphasis added). In 1977, the Rule implementing Article 23 was revised and renumbered as 757b, yet the substantive language did not change:
> The court may, and at the request of any party shall, give those advisory instructions to the jury as correctly state the applicable law. The court may give its instructions orally or, with the consent of the parties, in writing. The court need not grant any requested instruction if the matter is fairly covered by the instructions actually given. <u>In every case in which instructions are given to the jury the court shall instruct the jury that they are the judges of the law and that the court's instructions are advisory only</u>.

Md. Rule 757b (emphasis added). In 1984, this was Rule was revised and restructured as Rule 4-325. When Rule 4-325 was promulgated, the advisory only jury instruction was omitted.

not repeat it here. It is enough to say that the Court was not wrong, much less clearly wrong, in determining that *Stevenson* and *Montgomery* established a new State constitutional standard that could not be considered waived, requiring the overruling of *Adams* and the portions of *Stevenson* and *Montgomery* that held to the contrary.

The State is in the unfortunate position of decrying the "ping-pong" between the Court's holding in *Adams* and *Unger*, decided three and a half years apart, and seeking just one more "ping" by urging that *Unger* be overruled and *Adams* resurrected. We must decline. Where the Court has previously recognized a new State constitutional standard as fundamental to due process, deference to that precedent ensures the constancy upon which due process endures.

## IV.

We turn next to the State's contention that the circuit court erred by granting Waine's motion to reopen his petition for postconviction relief to entertain his *Unger* claim. The State argues that the court's rationale for granting the petition demonstrates the court's failure to recognize that it had the discretion to deny reopening. We disagree.

The circuit court's written statement of reasons for reopening the postconviction proceeding to hear the *Unger* claim demonstrates that the court both recognized that the decision to reopen is discretionary and properly exercised that discretion. It is evident that the court had carefully reviewed the record and relevant case law, including *Gray v. State*, 388 Md. 366 (2005), and *Unger*; understood that *Unger* has retrospective application to specific advisory only instructions; appreciated that the claim of error reached "to the very

core of due process of law"; and concluded that reopening the proceeding to consider that claim for relief would be in the interests of justice.

The State also argues that, should we decline to overrule *Unger*, as we have done, we should consider whether judges retain discretion to deny motions to reopen postconviction proceedings after *Unger*. We recognized in *Gray* that a change in the law intended to apply retroactively meets the "interests of justice" standard for reopening a petition for postconviction relief. 388 Md. at 382-83. This is both independent of and consistent with Section 7-106(c)(2) of the Criminal Procedure Article:

> Notwithstanding any other provision of this title, an allegation of error may not be considered to have been finally litigated or waived under this title if a court whose decisions are binding on the lower courts of the State holds that:
> (i)     the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a procedural or substantive standard not previously recognized; and
> (ii)    the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence.

Md. Code Ann., Crim. Proc. § 7-106(c)(2) (2001, Repl. Vol. 2008). Given the nature of this claim and others like it, the legal landscape that prevailed at the time of Waine's trial, and the case law that developed in the decades between *Stevenson* and *Unger* suggesting the likelihood that an unobjected to jury instruction would be considered waived, it can hardly be said that reopening a postconviction proceeding to consider an *Unger* claim would be an abuse of discretion.

## V.

Finally, the State asks us to consider what test a court must apply in considering a challenge to an advisory only jury instruction. Rather than adopting the standard set forth

in *Unger*, the State urges that advisory only instructions be considered on a case by case basis to determine whether there is a "reasonable likelihood" that the jurors understood the court's Article 23 instruction as allowing them to convict a defendant on less than proof beyond a reasonable doubt. The State's reliance on the "reasonable likelihood" test is misplaced, as this was the test adopted by the Supreme Court for review of jury instructions that are ambiguous. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) ("[I]n reviewing an ambiguous instruction such as the one at issue here, we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (quoting *Boyde v. Californ*ia, 494 U.S. 370, 380 (1990))); *see also Victor v. Nebraska*, 511 U.S. 1, 6 (1994).

Ambiguity is not the issue in Article 23 advisory only jury instructions; rather, such instructions are clear, but erroneous, as they give the jury permission to disregard any or all of the court's instructions, including those bedrock due process instructions on the presumption of innocence and the State's burden of proving the defendant's guilt beyond a reasonable doubt. *See Unger*, 427 Md. at 389, 409. This is illustrated by *Sullivan v. Louisiana*:

> But the essential connection to a "beyond a reasonable doubt" factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings. A reviewing court can only engage in pure speculation—its view of what a reasonable jury would have done. And when it does that, the wrong entity judge[s] the defendant guilty.
>
> Another mode of analysis leads to the same conclusion that harmless-error analysis does not apply: In *Fulminante*, we distinguished between, on the one hand, structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards, and, on the other hand, trial errors

11

which occur during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented. Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly an error of the former sort, the jury guarantee being a basic protectio[n] whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function. The right to trial by jury reflects, we have said, a profound judgment about the way in which law should be enforced and justice administered. The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error."

508 U.S. 275, 281-82 (1993) (alteration in original) (internal quotation marks and citations omitted) (citing *Arizona v. Fulminante*, 499 U.S. 279, 307-09 (1991)).

The rationale underpinning *Sullivan* applies equally to advisory only jury instructions. We therefore hold that the trial court's giving the advisory only jury instruction was structural error not susceptible to harmless error analysis and that the conviction must be vacated.

VI.

In sum, we uphold *Unger* as the law regarding advisory only jury instructions. The postconviction court properly granted Waine relief in the form of a new trial. The Court of Special Appeals affirmed that ruling. We, in turn, affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY HARFORD COUNTY.**

Judges Harrell and Adkins join the judgment only. Judge Harrell writes separately as follows, to which sentiments Judge Adkins subscribes.

I feel a little like Jabez Stone.[1] Judge Watts's dissenting opinion in this case is quite tempting, given my dissent in *Unger v. State*, 427 Md. 383, 418–40, 48 A.3d 242, 262–76 (2012); however, more compelling here is my respect for the doctrine of stare decisis.[2] One could say (and the irony is not lost on me) that I am hoisting myself on my own petard. Nonetheless, I will not require the services of Daniel Webster to fight for my soul.

I can articulate no changes in society between 2012 and now that would justify not honoring the stare decisis effect of *Unger* in Waine's case. Similarly, no new jurisprudential principles or statutory changes have arisen during that time which would justify labeling *Unger* "clearly wrong, contrary to established principles, or superseded by significant changes in the law." To be certain, *Unger* was decided wrongly, but I cannot label it "clearly wrong."

---

[1] The New Hampshire farmer tempted by (and succumbing to) Mr. Scratch's blandishments in Stephen Vincent Benet's short story "The Devil and Daniel Webster" (1937).

[2] Had the Majority in *Unger* paid more than lip service to stare decisis, *State v. Adams*, 406 Md. 240, 958 A.2d 295 (2008), would not have been reversed and would still be the law of Maryland. I agree with Judge Watts's surmise that the different outcome in *Unger* on the identical question decided in *Adams* had all to do with the changes in who sat on the Court in 2012 than in 2008, and little to nothing to do with any intervening sea change in the modernity of society or the creation of new jurisprudential reasons from which *Adams* could be said (with any legitimacy) to have been "clearly wrong."

By the same token, I do not subscribe to the overly reverential tone in the Majority opinion here of *Unger*. For example, the Majority opinion states, "[t]he *Unger* Court, in reaching the legal conclusions that it did, applied the very principles of, and exceptions to, the doctrine of stare decisis . . . ." Maj. Slip Op. at 8. To this, I respond, "Seriously???" – see my dissent in *Unger*, 427 Md. at 430–33, 48 A.3d at 269–71.

For these reasons, Judge Adkins and I do not join the Majority opinion, but join the judgment only.

Circuit Court for Harford County
Case No. 12-K-75005312

Argued: May 12, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 90

September Term, 2014

_____

STATE OF MARYLAND

v.

PETER SUTRO WAINE

_____

Barbera, C.J.
*Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: August 28, 2015

*Harrell, J., now retired, participated in the hearing and conference of the case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Respectfully, I dissent. "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." Henslee v. Union Planters Nat'l Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting). I would overrule Unger v. State, 427 Md. 383, 411, 48 A.3d 242, 258 (2012); reinstate Stevenson v. State, 289 Md. 167, 178, 423 A.2d 558, 564 (1980), Montgomery v. State, 292 Md. 84, 87-88, 437 A.2d 654, 656 (1981), and State v. Adams, 406 Md. 240, 256, 958 A.2d 295, 305 (2008); and hold that a petitioner for postconviction relief waives a challenge to "advisory" jury instructions by failing to raise any issue as to the "advisory" jury instructions in a prior proceeding.

Here, we are asked to overrule Unger, 427 Md. at 411, 48 A.3d at 258, whose holding regarding "advisory" jury instructions casually overruled decades' worth of well-established case law. At its core, this case presents the paradox that the doctrine of *stare decisis* supports overruling a case.[1] For more than three decades, Stevenson, 289 Md. at 178, 423 A.2d at 564, was the law of Maryland. The bench and bar relied on Stevenson, and justifiably so; this Court reaffirmed Stevenson one year after issuing it, see Montgomery, 292 Md. at 87-88, 437 A.2d at 656, and then once again twenty-eight years after issuing it, see Adams, 406 Md. at 259, 958 A.2d at 307. But then, a mere four years after Adams, in Unger, 427 Md. at 417, 48 A.3d at 261, without valid reason, this Court overruled Adams and decades' worth of other case law in which we consistently recognized

---

[1]"Under *stare decisis*, absent extremely narrow exceptions, an appellate court does not overrule its precedent. *Stare decisis* promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Thompson v. UBS Fin. Servs., Inc., 443 Md. 47, 57-58, 115 A.3d 125, 131 (2015) (citations and internal quotation marks omitted).

that Article 23 of the Maryland Declaration of Rights and its predecessors mean that, in a criminal case, the jury is the judge of the law of the crime.

In overruling this raft of case law in Unger, this Court struck a blow to *stare decisis*, rocked lawyers' and courts' confidence that this Court would not lightly abandon its precedent, and gave members of the public reason to believe that this Court's decision-making is based on the views of the individual judges who decide a case, regardless of existing case law. Today, this Court has the opportunity to right these wrongs, restore *stare decisis* to its proper place, and make clear that, because this Court nonchalantly demolished decades' worth of case law in Unger, that case represents an aberration that thwarts the doctrine of *stare decisis*. Unfortunately, the Majority fails to take advantage of this opportunity, and instead reaffirms Unger with barely any analysis, original thought, or consideration of historical context. See Maj. Slip Op. at 7-9.

Foremost, Unger is disconcerting in light of the circumstance that this Court simply turned parts of the dissent in Adams, 406 Md. at 312-40, 958 A.2d at 339-56 (Eldridge, J., dissenting) into the majority opinion in Unger, 427 Md. at 411, 48 A.3d at 258. As the Honorable Glenn T. Harrell, Jr. pointed out in Unger, 427 Md. at 430 n.7, 418, 48 A.3d at 270 n.7, 262 (Harrell, J., dissenting), "more is required, before deviating from stare decisis, than simply re-potting those dissenting views as a Majority opinion here"; "[t]he only thing that appears to have changed in the few intervening years between *Adams* and [*Unger*] is the composition of [this] Court." As Judge Harrell later demonstrated, a dissenting judge must realize that, as of this Court's issuance of the majority opinion from which the judge dissents, the judge's views' opposite—*i.e.*, the majority opinion—becomes the law of

Maryland.  See Dep't of Pub. Safety & Corr. Servs. v. Doe, 439 Md. 201, 238, 94 A.3d 791, 813 (2014) (Harrell, J., concurring) ("I did not join the reasoning . . . of the plurality of the judges in . . . *Doe I* . . . . I concur in the judgment of [this] Court's opinion in the present case, assuming that *Doe I* was decided correctly.  It is, after all, the law of Maryland.").

Under the well-established framework of *stare decisis*, it is readily apparent that Unger was clearly wrong and contrary to established principles,[2] not only because this Court lightly cast aside *stare decisis* in Unger, but also because, in Unger, this Court erroneously reasoned that, in Adams, 406 Md. at 256, 958 A.2d at 305, this Court was wrong in concluding that this Court did not "announce new law" in Stevenson or Montgomery.[3]  To adequately explain why this Court did not "announce new law" in

---

[2]"[A]n appellate court need not adhere to *stare decisis* where the appellate court's precedent was clearly wrong and contrary to established principles."  Thompson v. UBS Fin. Servs., Inc., 443 Md. 47, 58 n.5, 115 A.3d 125, 131 n.5  (2015) (citation and internal quotation marks omitted).

[3]Whether this Court "announced new law" in Stevenson or Montgomery determines whether a petitioner for postconviction relief waives a challenge to an "advisory" jury instruction by failing to object to the "advisory" jury instruction in a prior proceeding.  See Md. Code Ann., Crim. Proc. (2001, 2008 Repl. Vol.) ("CP") § 7-106(b)(1)(i) ("[A]n allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation: 1. before trial; 2. at trial; 3. on direct appeal, whether or not the petitioner took an appeal; 4. in an application for leave to appeal a conviction based on a guilty plea; 5. in a habeas corpus or coram nobis proceeding began by the petitioner; 6. in a prior petition under this subtitle; or 7. in any other proceeding that the petitioner began." (Paragraph breaks omitted)); CP § 7-106(c)(2) ("[A]n allegation of error may not be considered to have been . . . waived . . . if a court whose decisions are binding on the lower courts of the State holds that: (i) the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a procedural or substantive standard **not previously recognized**; and (ii) the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence." (Emphasis added) (paragraph breaks omitted)).

Stevenson or Montgomery, a thorough analysis is needed.

In 1776, under English common law, in a criminal case, the trial court decided the law, and the jury applied the law to the facts. See Slansky v. State, 192 Md. 94, 101, 63 A.2d 599, 601 (1949). The English common law principle "was condemned by some of the Colonial statesmen, notably John Adams, who believed that the juries should be entitled to disregard the arbitrary and unjust rulings of the [trial] judges holding office by authority of the" King of England. Id. at 101, 63 A.2d at 601; see also id. at 101, 63 A.2d at 601-02 ("In some of the . . . Colonies[,] it was fully understood that the [trial] judges held office not for the purpose of deciding causes, for the jury decided all questions of both law and fact, but merely to preserve order and see that the parties were treated fairly before the jury. This procedure received patriotic justification as increasingly oppressive measures were taken by the royal officials; however, the fact that many of the [trial] judges had not studied law was probably an additional explanation for the procedure.").

The Constitution of Maryland of 1776 did not expressly indicate whether the jury was the judge of the law in a criminal case. See id. at 104, 63 A.2d at 603. As a result, "opposing views as to the powers of [the] jury in a criminal case[] prevailed in different parts of" Maryland. Franklin v. State, 12 Md. 236, 245 (1858) (LeGrand, C.J., concurring). To secure uniformity of decision, the Constitution of Maryland of 1851 included Article X, Section 5 of the Maryland Declaration of Rights, which stated: "In the trial of all criminal cases, the jury shall be the judges of law as well as fact." See id. (LeGrand, C.J., concurring) ("[T]o guard in the future against . . . conflict, the provision was inserted in the constitution.").

- 4 -

This Court consistently recognized that Article X, Section 5 and its successors mean that, in a criminal case, the jury is the judge of the "law of the crime;" in other words, the jury applies the law of the crime (*e.g.*, the law against murder) to the facts, and cannot make any other legal determination (*e.g.*, that a statute is unconstitutional). For example, in Franklin, id. at 249, the very first case in which this Court mentioned Article X, Section 5, this Court stated that Article X, Section 5 did not enable the jury in a criminal case to conclude that a statute is unconstitutional. As to that issue, a majority of this Court adopted the concurring opinion of Chief Justice John Carroll LeGrand, id. at 249, who stated that, under Article X, Section 5, "in a criminal case[,] the jury [is] not bound to abide by the interpretation of the [trial] court of the meaning of a law, but [is] free to **construe and apply** it according to [the jurors'] own judgments"; in other words, instead of having "the right to decide on the constitutionality of **an act defining murder, arson[,] or any other crime**, [the jurors] had the right to affix their own meaning on the particular law, and to determine for themselves, **whether the facts proven brought the [defendant] within that meaning**[,]" id. at 246 (LeGrand, C.J., concurring) (emphasis added).

In several cases after Franklin, this Court reaffirmed the principle that Article X, Section 5 and its successors: (1) mean that, in a criminal case, the jury is the judge of the law of the crime; and (2) do not enable the jury to make any other legal determination (*e.g.*, whether a piece of evidence is admissible). See Wheeler v. State, 42 Md. 563, 570 (1875) ("[A]ny instruction given by the [trial c]ourt, as to **the law of the *crime***, is but advisory, and in no manner binding upon the jury, except in regard to questions as to what shall be considered as evidence." (Some emphasis in original)); Bloomer v. State, 48 Md. 521, 540

- 5 -

(1878) ("[I]t was the duty of the [trial c]ourt to leave it to the jury to say[] whether the evidence was **sufficient in law and in fact** to prove the [crime] charged." (Emphasis added)); Beard v. State, 71 Md. 275, 280, 17 A. 1044, 1045 (1889) ("The [trial court] . . . cannot, by any instruction given in a criminal case, bind the jury as to the definition of the crime, or as to **the legal effect of the evidence** before them." (Emphasis added)); Ridgely v. State, 75 Md. 510, 513, 23 A. 1099, 1100-01 (1892) (same) (quoting Beard, 71 Md. at 280, 17 A. at 1045); Dick v. State, 107 Md. 11, 17, 68 A. 286, 288 (1907) ("[T]he jury in criminal cases are the judges of the law, and of **the legal effect and legal sufficiency of the evidence**, and the [trial] court . . . determines [only] the admissibility of the evidence." (Emphasis added)); Jessup v. State, 117 Md. 119, 123, 83 A. 140, 142 (1912) (same) (quoting Dick, 107 Md. at 17, 68 A. at 288); Vogel v. State, 163 Md. 267, 274, 162 A. 705, 707-08 (1932) ("The statement in *Dick*[, 107 Md. at 17, 68 A. at 288], and *Beard*[,71 Md. at 280, 17 A. at 1045], that the [trial] court could not bind the jury as to the 'legal effect of the evidence,' referred to the **effect, in law, of admitted evidence upon the issue of guilt or innocence**[.]" (Emphasis and italics added)); Dillon v. State, 277 Md. 571, 581-82, 357 A.2d 360, 367 (1976) (Article X, Section 5 and its successors "'contemplate[] that it is within the proper province of the jury to resolve conflicting interpretations of the law and to **decide whether the law should be applied in dubious factual situations**,' but 'it **does not confer upon them . . . untrammeled discretion to enact new law or to repeal or ignore clearly existing law** as whim, fancy, compassion or malevolence should dictate, even within the limited confines of a single criminal case." (Quoting Hamilton v. State, 12 Md. App. 91, 98, 277 A.2d 460, 464 (1971) (Moylan, J.), aff'd, 265 Md. 256, 288 A.2d

- 6 -

885 (1972)) (emphasis added) (parentheses and internal quotation marks omitted));
Blackwell v. State, 278 Md. 466, 479, 365 A.2d 545, 553 (1976) (same) (citation omitted).

It may seem inconsistent that: (1) this Court construed Article X, Section 5 and its successors to mean that, in a criminal case, the jury is the judge of the law of the crime; whereas (2) Article X, Section 5's language that "the jury shall be the judges of law" suggests that its purpose was to supersede the English common law principle that, in a criminal case, the jury only applied the law of the crime to the facts, see Slansky, 192 Md. at 101, 63 A.2d at 601. There is, however, no such inconsistency; Article X, Section 5's purpose was actually to codify the English common law principle. As noted above, the English common law principle was in effect in 1776. See id. at 101, 63 A.2d at 601. In that year, Maryland received the English common law, see Md. Decl. of Rts. Art. 3 (1776) ("[T]he inhabitants of Maryland are entitled to the common law of England[.]"), and the Constitution of Maryland of 1776 was otherwise silent regarding whether the jury was judge of the law in a criminal case, see Slansky, 192 Md. at 104, 63 A.2d at 603. Thus, despite the "opposing views as to the powers of [the] jury in a criminal case" between 1776 and 1851, Franklin, 12 Md. at 245 (LeGrand, C.J., concurring), Maryland received in 1776 the English common law principle that, in a criminal case, the trial court decided the law, and the jury applied the law to the facts. Indeed, as this Court expressly recognized, Article X, Section 5 of the Constitution of Maryland of 1851 did not supersede the English common law principle; to the contrary, Article X, Section 5 codified it. See id. at 249 (This Court stated that Article X, Section 5 "is merely **declaratory**, and **has not altered the pre-existing law** regulating the powers of the [trial] court and [the] jury in criminal cases."

- 7 -

(Emphasis added)); see also In re Glenn, 54 Md. 572, 600 (1880) (Article X, Section 5 is "only **declaratory of the pre-existing common law** upon the subject." (Citing Franklin, 12 Md. at 249) (emphasis added)). Thus, Article X, Section 5's purpose was to secure uniformity of decision in favor of the English common law principle, not against it. See Franklin, 12 Md. at 245 (LeGrand, C.J., concurring) ("[T]o guard in the future against . . . conflict, the provision was inserted in the constitution.").

Given that Article X, Section 5's purpose was to codify the English common law principle, one may wonder why Article X, Section 5's drafters chose the words "the jury shall be the judges of law[.]" The reason is simple: Article X, Section 5's drafters wanted to make clear that, in a criminal case in which a jury trial occurred, the jury, and **only** the jury, applied the law of the crime to the facts; in other words, the trial court could not apply the law of the crime to the facts by ordering a directed verdict (whether guilty or not guilty), and an appellate court could not could not apply the law of the crime to the facts by reviewing the sufficiency of the evidence. See Newton v. State, 147 Md. 71, 87, 127 A. 123, 130 (1924) (Citing Article X, Section 5's identical successor, this Court noted that a trial court cannot order "a directed verdict in [a] criminal case[]"; this Court disapproved of Horning v. District of Columbia, 254 U.S. 135, 139 (1920), in which the Supreme Court held that a trial court did not err in telling a jury: "I cannot tell you, in so many words, to find defendant guilty, but what I say amounts to that."); Deems v. State, 127 Md. 624, 628, 96 A. 878, 879 (1916) ("The [trial] court is given no authority to decide as to the . . . sufficiency of [the] evidence . . . . It is expressly denied the right to determine a question of that nature by" Article X, Section 5's identical successor. (Citing Dick, 107 Md. at 17,

68 A. at 288; Jessup, 117 Md. at 123, 83 A. at 142)); Wolf v. State, 143 Md. 489, 493, 122 A. 641, 642-43 (1923) ("Under the Constitution of [Maryland] . . . . [i]t is . . . not within our jurisdiction, as an appellate tribunal, to determine as to the legal sufficiency of the evidence[.]" (Citing Weeks v. State, 126 Md. 223, 229, 94 A. 774, 776 (1915); Jessup, 117 Md. at 123, 83 A. at 142)). Of course, it is no longer the law that, in a criminal case in which a jury trial occurs, a court cannot apply the law of the crime to the facts; today, a trial court can enter a judgment of acquittal, and an appellate court can reverse a conviction that is based on insufficient evidence. See Md. Const. Art. XV, Sec. 5 (amended 1950) ("In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, **except that the Court may pass upon the sufficiency of the evidence to sustain a conviction**." (Emphasis added)); Md. Decl. of Rts. Art. 23 (2010) (same).[4] That said, it remains the law that a trial court cannot order a directed verdict of guilty—as Article 23 and its predecessors have contemplated.

In sum, this Court consistently recognized that Article 23 and its predecessors mean that, in a criminal case, the jury is the judge of the law of the crime. Thus, in Stevenson, 289 Md. at 178, 423 A.2d at 564, this Court was correct in noting that, under more than a century's worth of precedent, in a criminal case, the jury's "authority is limited to deciding 'the law of the crime,' *Wheeler*[], 42 Md. [at] 570[], or 'the definition of the crime,' as well as 'the legal effect of the evidence before (the jury).' *Beard*[], 71 Md. [at] 280, 17 A. [at]

---

[4]In 1978, through a constitutional amendment, Article XV, Section 5 was recodified as Article 23 of the Maryland Declaration of Rights. See 1977 Md. Laws 2743-49 (Ch. 681, H.B. 463).

1045[].  And this Court has consistently interpreted [Article 23 and its predecessors] as restraining the jury's law[-]deciding power to this limited, albeit important, area."  See also Stevenson, 289 Md. at 177-78, 423 A.2d at 563-64 (This Court quoted Franklin, 12 Md. at 245-46 (LeGrand, C.J., concurring) for the principle that "the jury was not granted, by Article 23[ and its predecessors], the power to decide all matters that may be correctly included under the generic label 'law.'").  One year after Stevenson, in Montgomery, 292 Md. at 87-88, 437 A.2d at 656, in accordance with Stevenson and earlier precedent, this Court correctly reaffirmed that, in a criminal case, the jury's "authority is limited to deciding the law of the crime, or the definition of the crime, as well as the legal effect of the evidence before the jury."  (Quoting Stevenson, 289 Md. at 178, 423 A.2d at 564) (citations, parentheses, and internal quotation marks omitted).[5]

Twenty-seven years after Montgomery, in Adams, 406 Md. at 256, 958 A.2d at 305, writing for this Court, Judge Harrell correctly and cogently explained that "*Stevenson* and *Montgomery*, by their express terms, did not announce new law."  See also Adams, 406 Md. at 257, 958 A.2d at 305 ("[T]he *Stevenson* court is clear that it did not make new law, but rather it merely clarified what has always been the law in Maryland."  (Citation and internal quotation marks omitted)).  Appropriately taking *stare decisis* into account, Judge Harrell declared: "We shall not here disturb the holdings of *Montgomery* and *Stevenson*."

---

[5]Tellingly, the dissent in Stevenson, 289 Md. at 189-204, 423 A.2d at 570-77 (Eldridge, J., dissenting), and the concurrence in Montgomery, 292 Md. at 96, 437 A.2d at 660 (Eldridge, J., concurring) failed to dispute that this Court consistently recognized that Article 23 and its predecessors mean that, in a criminal case, the jury is the judge of the law of the crime.

Adams, 406 Md. at 259, 958 A.2d at 307.

In Adams, the dissent disputed that this Court consistently recognized that Article 23 and its predecessors mean that, in a criminal case, the jury is the judge of the law of the crime. Specifically, the dissent accused this Court of "re-draft[ing]" Article 23 in both Stevenson and Adams. Adams, 406 Md. at 301, 958 A.2d at 332 (Eldridge, J., dissenting). The dissent attempted to support its accusation with multiple unpersuasive contentions.

The dissent asserted that none of this Court's precedent "support[s] the proposition that the jury's right to decide the law in criminal cases is limited to the 'law of the crime' and the 'legal effect of the evidence.'" Adams, 406 Md. at 313-14, 958 A.2d at 340 (Eldridge, J., dissenting) (footnote omitted). The dissent attempted to reconcile its assertion with Wheeler, 42 Md. at 570 ("[A]ny instruction given by the [trial c]ourt, as to **the law of the *crime***, is but advisory, and in no manner binding upon the jury, except in regard to questions as to what shall be considered as evidence." (Some emphasis in original)) and Beard, 71 Md. at 280, 17 A. at 1045 ("The [trial court] . . . cannot, by any instruction given in a criminal case, bind the jury as to the definition of the crime, or as to **the legal effect of the evidence** before them." (Emphasis added)) by myopically fixating on the circumstance that this Court did not use the word "limited" or a similar term. See Adams, 406 Md. at 312 n.7, 314, 958 A.2d at 339 n.7, 340 (Eldridge, J., dissenting).

Respectfully, the dissent's observation was beside the point. In Wheeler, 42 Md. at 570, Beard, 71 Md. at 280, 17 A. at 1045, and voluminous other cases, this Court did not need to use the word "limited" or a similar term in interpreting Article 23 and its predecessors; by definition, if Article 23 and its predecessors mean one thing, then Article

- 11 -

23 and its predecessors do not mean anything else. By way of comparison, generally, where a statute expressly defines a term as "X, Y, or Z," that statutory definition excludes any meaning other than "X, Y, or Z." See Potomac Abatement, Inc. v. Sanchez, 424 Md. 701, 712, 37 A.3d 972, 978 (2012) (Under the doctrine of *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of another"), "statutory lists are often interpreted as exclusive, so that a court will draw the negative inference that no other items may be added." (Citation omitted)). Thus, if Article 23 and its predecessors mean that the jury is the judge of the law of the crime, then Article 23 and its predecessors do **not** mean that the jury is able to make any other legal determination. It follows that this Court did not "announce new law" in Stevenson, 289 Md. at 178, 423 A.2d at 564, by accurately noting that, under more than a century's worth of precedent, in a criminal case, the jury's "authority is limited to deciding 'the law of the crime,' *Wheeler*[], 42 Md. [at] 570[], or 'the definition of the crime,' as well as 'the legal effect of the evidence before (the jury).' *Beard*[], 71 Md. [at] 280, 17 A. [at] 1045[]."

The dissent interpreted snippets of *dicta* in an attempt to support the proposition that there were only two "exceptions" to Article 23 and its predecessors: the admissibility of a piece of evidence, and the constitutionality of a statute. See Adams, 406 Md. at 312 n.7, 314, 315-17, 958 A.2d at 339 n.7, 340, 341-42 (Eldridge, J., dissenting). For example, the dissent misplaced its reliance on the word "except" in Wheeler, 42 Md. at 570 ("[A]ny instruction given by the [trial c]ourt, as to the law of the *crime*, is but advisory, and in no manner binding upon the jury, except in regard to questions as to what shall be considered as evidence." (Emphasis in original)) and the word "only" in Beard, 71 Md. at 280, 17 A.

- 12 -

at 1045 (A trial court "can only bind . . . the jury as to what evidence shall be considered by" the jury.). See Adams, 406 Md. at 312 n.7, 958 A.2d at 339 n.7 (Eldridge, J., dissenting).

The dissent's strained interpretation of these isolated words is undermined not only by the bevy of cases in which this Court consistently recognized that Article 23 and its predecessors mean that, in a criminal case, the jury is the judge of the law of the crime, see, e.g., Bloomer, 48 Md. at 540 ("[I]t was the duty of the [trial c]ourt to leave it to the jury to say[] whether the evidence was sufficient in law and in fact to prove the [crime] charged."), but also by the circumstance that the admissibility of a piece of evidence and the constitutionality of a statute are far from the only "exceptions" to Article 23 and its predecessors; for example, this Court has long held that Article 23 and its predecessors do not enable the jury to determine: (1) when a statute became effective, see Slymer v. State, 62 Md. 237, 241 (1884); (2) whether the General Assembly has repealed a statute, see Nolan v. State, 157 Md. 332, 340, 146 A. 268, 271 (1929); or (3) whether the trial court has jurisdiction, see Kelly v. State, 151 Md. 87, 98-99, 133 A. 899, 903 (1926).

The dissent asserted that "[t]his Court has never explained what legal issues precisely fall within the phrases 'law of the crime' and 'legal effect of the evidence.'" Adams, 406 Md. at 314 n.8, 958 A.2d at 340 n.8 (Eldridge, J., dissenting). The dissent was mistaken. In Franklin, 12 Md. at 249, a majority of this Court adopted part of the concurring opinion of Chief Justice LeGrand, who equated "the law of the crime" with "an act defining murder, arson[,] or any other crime," id. at 246 (LeGrand, C.J., concurring). In Vogel, 163 Md. at 274, 162 A. at 707-08, this Court defined "legal effect of the

- 13 -

evidence" as "the effect, in law, of admitted evidence upon the issue of guilt or innocence[.]" (Citations omitted).

The dissent listed multiple cases in which this Court stated that, if a trial court instructs the jury, the trial court must label the jury instructions as "advisory." See Adams, 406 Md. at 318-25, 958 A.2d at 342-47 (Eldridge, J., dissenting). For example, the dissent noted that, in Klein v. State, 151 Md. 484, 493, 489, 135 A. 591, 595, 593 (1926), this Court affirmed a conviction where a trial court instructed a jury about the presumption of innocence and the burden of proof beyond a reasonable doubt, but told the jury that the jury instructions were "advisory"; this Court stated: "[T]he [trial] court cannot give [the jury] binding instructions in [criminal] cases." See Adams, 406 Md. at 320-21, 958 A.2d at 344 (Eldridge, J., dissenting). The dissent failed to mention that this Court's statement in Klein, 151 Md. at 489, 135 A. at 594, was *dicta*; the issue of the jury instructions' propriety was "not . . . properly before" this Court because the defendant "fail[ed] . . . to point out the specific instructions to which he objected." Id. at 489, 490, 135 A. at 594. Indeed, in no case, including Klein, has this Court ever held that a trial court did not err in giving "advisory" jury instructions that implicate federal constitutional rights (such as the presumption of innocence).[6] Thus, the dissent's reliance on Klein and similar cases was

---

[6]It is true that Maryland Rule 757b (1963 Repl. Vol.) stated: "The court shall in every case in which instructions are given to the jury, instruct the jury that they are the judges of the law and that the court's instructions are advisory only." However, Maryland Rule 757b does not necessarily stand for the proposition that this Court condoned giving "advisory" jury instructions that implicated federal constitutional rights. This Court rejected facial challenges to Article 23 and its predecessors based on federal constitutional rights in Slansky, 192 Md. at 99, 111, 63 A.2d at 601, 606, Giles v. State, 229 Md. 370,

- 14 -

misplaced.[7]

Tellingly, the dissent did not even mention, much less address, *stare decisis*, see Adams, 406 Md. at 299-340, 958 A.2d at 331-56 (Eldridge, J., dissenting); instead, the dissent acted as though it were writing on a blank slate, when in fact Stevenson and Montgomery had already been carved into the law of Maryland.

A mere four years after Adams, in Unger, this Court pummeled *stare decisis* by overruling Adams and decades' worth of other case law and reasoning that "*Stevenson* and *Montgomery . . .* set forth a new interpretation of Article 23[.]" Unger, 427 Md. at 411, 48 A.3d at 258. In Unger, instead of meaningfully attempting to meet the high burden of establishing that Adams was clearly wrong and contrary to established principles, this Court simply adopted parts of the dissent in Adams, see Unger, 427 Md. at 411, 48 A.3d at 258, and essentially copied-and-pasted several passages from the dissent in Adams into

---

382, 183 A.2d 359, 364 (1962), and Stevenson, 289 Md. at 189, 423 A.2d at 570, but this Court did not consider an as-applied challenge to Article 23 and its predecessors based on federal constitutional rights until Montgomery, 292 Md. at 89-90, 437 A.2d at 657 ("[I]t was error [for a trial court] to instruct [a] jury that [its] instructions were advisory and that the jury could pay absolutely no attention to [its] instructions."). In other words, until Montgomery, this Court never addressed whether a trial court erred in giving "advisory" jury instructions that implicated federal constitutional rights; and, in no case has this Court ever condoned giving "advisory" jury instructions that implicated federal constitutional rights.

[7]As another example, the dissent noted that, in Bruce v. State, 218 Md. 87, 98, 145 A.2d 428, 434 (1958), this Court stated: "[A]s [a trial] court properly advised [a] jury, the defendant is 'presumed to be innocent until proven guilty beyond a reasonable doubt, and that presumption attends him throughout the trial until overcome by proof establishing his guilt beyond a reasonable doubt and to a moral certainty.'" See Adams, 406 Md. at 320, 958 A.2d at 344 (Eldridge, J., dissenting). This Court's statement in Bruce was *dicta*; at issue was the propriety of jury instructions regarding the difference between murder and manslaughter, not jury instructions that implicated federal constitutional rights.

Unger, compare Adams, 406 Md. at 312-36, 958 A.2d at 339-53 (Eldridge, J., dissenting) with Unger, 427 Md. at 411-16, 48 A.3d at 258-61. Tellingly, in Unger, without any careful analysis, this Court stated that Stevenson, Montgomery, and Adams were merely "erroneous," not "clearly wrong and contrary to established principles." Unger, 427 Md. at 417, 48 A.3d at 261, 262. Thus, the Majority is simply wrong in stating that "[t]he *Unger* Court, in reaching the legal conclusions that it did, applied the very principles of, and exceptions to, the doctrine of stare decisis, [on which] the State relies . . . in seeking a return to . . . *Stevenson, Montgomery*, and *Adams*[.]" Maj. Slip Op. at 8. Indeed, as Judge Harrell perceptively noted, this Court in Unger, much like the dissent in Adams, acted as though it were addressing "an open question requiring an answer, which, based on our holding in *Adams*, it clearly is not." Unger, 427 Md. at 429, 48 A.3d at 269 (Harrell, J., dissenting) (citation omitted).

The dissent in Adams was clearly wrong and contrary to established principles in disputing that this Court consistently recognized that Article 23 and its predecessors mean that, in a criminal case, the jury is the judge of the law of the crime. And, in Unger, this Court was even more clearly wrong in overruling Adams. The only correct result is to overrule Unger and restore Adams, Montgomery, and Stevenson to their rightful place as good law consistent with more than a century's worth of this Court's precedent.

Regrettably, this Court's precedent was not the only thing that Unger disturbed eons after it was thought to be settled. Unger opened the floodgates for individuals to exhume decades-old convictions for murder, rape, and other serious crimes. As a result, victims and their family members have been forced to relive traumatic experiences long after they

- 16 -

thought that they had finally achieved closure. Additionally, dozens of individuals have been released in Unger's wake.[8]

Despite Unger's consequences, the Majority refrains from overruling it, ostensibly based on good intentions and the honest belief that the Majority's decision bolsters *stare decisis*. See Maj. Slip Op. at 1, 6-9. In actuality, however, the Majority condones the blow to *stare decisis* that was brought about in Unger, and undermines even further "the evenhanded, predictable, and consistent development of legal principles, . . . reliance on judicial decisions, and . . . the actual and perceived integrity of the judicial process." Thompson v. UBS Fin. Servs., Inc., 443 Md. 47, 58, 115 A.3d 125, 131 (2015) (citation and internal quotation marks omitted). The Majority's decision will injure not only all of this Court's precedent, but also the public by permitting the reopening of serious criminal cases on unsound legal grounds.[9]

In short, although the Majority purports to avoid "generat[ing]" uncertainty," Maj. Slip Op. at 1, the Majority actually cultivates a lack of consistency in case law by

---

[8]Peter Sutro Waine, Respondent, and multiple *amici* note that, if this Court overrules Unger, some individuals will have benefitted from Unger, while others will have not. I am unpersuaded by the contention that this circumstance would create undue disparity. Because Unger was clearly wrong and contrary to established principles, those who have been released from incarceration were not entitled to relief in the first place. Now is the time to correct the error that is Unger; it is better to close the floodgates late than to never close them at all.

[9]As an aside, although I strongly disagree with the Majority's decision to reaffirm Unger, if Unger remains the law, I agree with the Majority that, here, the Circuit Court for Harford County did not abuse its discretion in reopening the postconviction proceeding based on a challenge to "advisory" jury instructions. See Maj. Slip Op. at 10. I also agree with the Majority that a challenge to "advisory" jury instructions is not controlled by the "reasonable likelihood" test. See Maj. Slip Op. at 11.

- 17 -

sanctioning the undermining of the doctrine of *stare decisis* that was perpetrated in <u>Unger</u>.

For the above reasons, respectfully, I dissent.